**AMERICAN OPTICAL COMPANY, C'Bon, Inc., and Cool-Ray, Inc., Plaintiffs,**

**v.**

**RAYEX CORPORATION and Monaco Optical Corporation, Defendants.**

**No. 66 Civ. 1633.**

United States District Court
S. D. New York.

April 26, 1967.

Amster & Rothstein, New York City, for plaintiffs; Morton Amster, James Reisman, New York City, J. Albert Hultquist, Southbridge, Mass., of counsel.

John Vaughan Groner, New York City (Gilbert Ehrenkranz, Orange, N.J., Jules

P. Kirsch, New York City, on the brief), for defendants.

TENNEY, District Judge.

On July 1, 1966, after a hearing had been held on plaintiffs' motion for a preliminary injunction, this Court ordered that the defendants be restrained and enjoined pending determination of the within action from continuing further activity and further ordered defendants to take certain affirmative steps, both of which directives will be more fully described hereinafter. See prior opinion in American Optical Co. v. Rayex Corp., 266 F.Supp. 342, S.D.N.Y., June 28, 1966. Plaintiffs move to cite defendants for contempt for failure to comply with the aforementioned order, in response to which the defendants have cross-moved for vacation of the order.

This litigation involves the alleged use by defendants, in their ski-sunglass catalog, of a photograph of plaintiffs' higher quality sunglass in connection with sales of defendants' inferior quality glass.

Plaintiff American Optical Company (hereinafter referred to as "AO") is a leading manufacturer and seller of sunglasses and lenses. Plaintiff C'Bon, Inc. (hereinafter referred to as "C'Bon") is a wholly-owned subsidiary which was created in 1965 for the purpose of creating, promoting and selling a quality line of high-style sunglasses. Defendants Rayex Corporation (hereinafter referred to as "Rayex") and Monaco Optical Corporation (hereinafter referred to as "Monaco") are also in the sunglass field. The sunglass catalog in issue herein is primarily directed toward the ski enthusiast.[1]

In defendant Rayex' "Astro-Ski" catalog circulated during 1965–1966, a photograph of sunglasses appeared designated as Alpine style No. 1011. Plaintiffs contend that this picture of Alpine style No. 1011 is in fact a photograph of plaintiff C'Bon's "Camelot" style glass. Indeed, this Court, in its prior order, found that sufficient evidence had been submitted preliminarily to justify a finding that the catalog photograph was of the Camelot.

An order was entered on July 1, 1966, enjoining and restraining defendants *inter alia* from using a photograph of the Camelot to sell defendants' Alpine model; using such a photograph in defendants' catalogs and advertisements; circulating a catalog or advertisement which contained such photograph; and selling said Alpine model pursuant to orders received but not filled as of June 28, 1966 or pursuant to orders received after June 28, 1966 but prior to circulation of defendants' new catalog.

Additionally, defendants were ordered to withdraw their "Astro-Ski" ski-glass catalog "By mailing to all persons * * known or believed to possess a copy of same, a letter in the form annexed as Exhibit A to this Order"; destroying all copies of said catalog in defendants' custody or control; and changing the designation of the 1011 Alpine. Defendants neither sought reargument nor appealed this decision.

### Plaintiffs' Motion to Punish for Contempt.

The basic argument presented by plaintiffs is that, although thousands of catalogs had been printed, only eleven so-called Exhibit A letters were circulated (if that many) and that these letters varied from the format of the letter designated by the Court as the letter to be used. Defendants contend that plaintiffs have failed to sustain their burden of proof that the injunction order was not complied with, and that the variation present in the letter allegedly sent was necessary as a matter of sound business judgment.

While it is fundamental law that a party seeking to punish his adversary for civil contempt must satisfy

---

1. In the prior Opinion of the Court, dated June 28, 1966, it was determined that a sufficient relationship existed between the products of plaintiffs and defendants so that they are in competition.

his burden of proof by clear and convincing evidence, Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102–03 (2d Cir. 1965) (per curiam); Stringfellow v. Haines, 309 F.2d 910, 912 (2d Cir. 1962), this Court is of the opinion, contrary to defendants' contention, that plaintiffs have more than amply sustained this burden, and that defendants' conduct has been in blatant disregard of the aforesaid preliminary injunction. The consistent manner in which defendants' "evidence" has disappeared,[1a] the convenient appearance at this time of material evidence nowhere accounted for at the time of the prior hearing, the haphazard manner in which defendants have kept their business records, the inconsistencies in statements made by defendants' employees on oral deposition and the superficial manner in which defendants have attempted to explain away these inconsistencies lead the Court to believe that, both for the purposes of this motion and for defendants' cross-motion, the evidence and testimony submitted by defendants is untrustworthy.

Raymond Tunkel, president of defendants Rayex and Monaco, stated in his deposition dated August 15–16, 1966 that in full compliance with the abovementioned order eleven Exhibit A letters were sent to wholesale distributors. In his affidavit submitted in conjunction with last June's application for an injunction, Tunkel stated that "The printer delivered to RAYEX a single edition of, *several thousand* copies of the ASTRO-SKI catalog in color, in mid-July, 1965." Tunkel Affidavit of June 13, 1966, at ¶ 14. (Emphasis added.) This "several thousand" turned out to be 15,250 copies, 9,000 of which were delivered to Rayex, New York, with the remaining catalogs being sent to Rayex, Canada, to Mail Pouch Tobacco Company, a distributor in the tobacco field, and Beconta, Inc., who was to be Rayex' exclusive distributor in the ski industry.

When Tunkel allegedly wrote to the eleven wholesale distributors, he did not request that these distributors ask their customers to withdraw the catalogs sent to them nor did he seek customer lists from his distributors because they would have become "indignant" as a result of such a request and would have threatened to stop doing business with Rayex, Although I do not think the injunction order would have required that Rayex attempt to obtain customer lists from its wholesale distributors and thereby endanger customer relations, a proper compliance with the "spirit" of the injunction would have obliged defendants at least to attempt to have their wholesalers pass on the message to their respective customers. This was not done. See Hollander v. Hollander, 318 F.2d 818 (2d Cir.) (per curiam), cert. denied, 375 U.S. 831, 84 S.Ct. 78, 11 L.Ed.2d 63 (1963); Cassidy v. Puett Elec. Starting Gate Corp., 182 F.2d 604, 606 (4th Cir. 1950). In this case it would be more than simply complying with the "spirit" of the order since defendants were to notify *all* persons "known or believed to possess a copy of" the offending catalog.

Moreover, in paragraph 15 of the Tunkel affidavit of June 13, 1966, it was stated that "This edition [the Astro-Ski catalog in issue] was promptly sent out by mail *to wholesale distributors of our regular glasses,* as well as to an exclusive ski distributor [Beconta]." (Emphasis added.) In his deposition, Mr. Tunkel drastically limits this statement: "Immediately after receipt [from the printer], they were circulated *to those few people who I thought would be proper for this catalog.*" Tunkel Deposition of November 14–15, 1966, at 817. (Emphasis added.) The first Tunkel statement creates an impression that all or quite a few of the regular customers of Rayex had received such a catalog while the second statement negates any such connotation. The reason for the inconsistency is obvious: At the time the Tunkel affidavit was prepared, there was

---

1a. E. g., the Alpine prototype and related documents and the Hallerman itinerary discussed infra.

no necessity of showing any limitation in the possible number of distributed catalogs but at the time of the Tunkel deposition such a need had arisen, for if the catalog had been sent to Rayex' regular customers why was a letter not sent to each of these customers directing the withdrawal of such catalog? Again, in the earlier Tunkel affidavit it is stated that certain changes were made in the 1011 Alpine but these changes were not reflected in the catalog picture because the catalog "had then already been *widely distributed.*" Tunkel Affidavit of June 13, 1966, at ¶ 19. Obviously, this does not jibe with Tunkel's limited distribution statement made on oral deposition in November of 1966 which has been set forth *supra.* I therefore conclude that Tunkel's later statement in his deposition, made at a time when he had a reason to falsify, is not worthy of belief.[2]

Accepting Tunkel's earlier statement that the catalog was sent to wholesale distributors of Rayex' regular sunglasses, it appears that Rayex reached between three and five thousand names on its Addressograph mailing list (Tunkel Deposition of November 14–15, 1966, at 866–67) rather than the approximately eleven names it claims were reached. Accordingly, it is my opinion that a minimum of three thousand letters should have been sent.

However, the word "minimum" must be stressed because further evidence leads me to believe that additional persons should have been contacted. Gordon Hallerman, the assistant sales manager of Rayex, stated on oral deposition that he had been on a number of selling trips during the months of September to December, 1965. During that period of time, he worked with Rayex sales representatives and called upon between 200–300 accounts. For those glasses that were not as yet available, sales were made by reference to the Astro-Ski catalog. Hallerman stated that at this time he and the sales representatives had the Astro-Ski catalog and that this was shown to prospective customers. Hallerman Deposition of November 8–9, 1966, at 403–04. Defendants contend that the major portion of the Hallerman testimony is irrelevant because it refers to the regular sunglass business of Rayex rather than to the Astro-Ski line. However, in my opinion, while at best the record in some instances is unclear, with respect to the above-mentioned information it is perfectly apparent that Hallerman and the sales representatives had the disputed catalog in their possession and exhibited it to prospective customers in an attempt to induce sales.

Certainly, then, notice of withdrawal of the catalog should have been given to the sales representatives and some effort should have been made to have these sales representatives give notice to their customers to fully comply with the injunction. In this respect, it is interesting to note that Hallerman had an itinerary of his sales trips which has, according to him, been lost or destroyed. Taken alone, this factor would possibly be credible. However, when taken in conjunction with the complete lack of any documentation on the part of defendants as to which distributors had received the catalog and the completely lackadaisical manner in which records of the catalog mailing were kept, the Hallerman representation that no list of customers visited in the fall of 1965 was available, is suspect. In any event, no explanation has been given for the failure to notify defendants' sales representatives of this Court's decision.

Hallerman further testified that after the injunction had been granted,

"Mr. Tunkel called a meeting of myself, Mr. Friedman [Rayex vice president in charge of sales] and a few other people and he asked us to sit down and think of all possible customers, the names of all customers that we think of to whom we delivered the Alpine 1011 * * *." Hallerman Depo-

2. Other discrepancies in the Tunkel deposition will be pointed out infra.

sition of November 8–9, 1966, at 346–47.

"Well, as I said before, a group of us sat down and tried to decide the names of those customers that we were familiar with, people that we had either called on or people from whom we might have received a request, any sort of information we could come up with which would help us in determining the names of the customers, and we tossed many names around and we wrote them down.

When we felt that we had exhausted every name that we could think of, we then went to what we call our blue file. Our blue file is a record kept in alphabetical order of the customers to whom we shipped merchandise and any shipments made there would be a blue for those shipments and we went through every name that we had.

Many of them we did not, indeed, ship the 1011 Alpine, we had shipped other glasses, but we did, in fact come across a few names where we did make shipment." Id. at 347–48.

The foregoing statement appears to represent the sum total of the action allegedly taken by defendants to fully comply with paragraph 2A of this Court's injunction order.[3] Plaintiffs contend that the very least defendants should have done at this point was to pull the blue file card for every customer who received *any one* of the Astro-Ski products depicted in the offending catalog. The Rayex catalog set forth seven styles of sunglasses and two assortments or "package deals". Plaintiffs argue that purchasers of any of the six styles other than the 1011 Alpine and of the two assortments must have used the condemned catalog in making such purchase and therefore notice should have been given to these customers as well. Counsel for defendants admit that there is some merit to this argument but claim, if anything, that this was a matter of judgment. Transcript of hearing of January 18, 1967, at 35. Ordinarily, I would concede that defendants' failure to follow plaintiffs' suggestion would be no more than a judgment error. However, in light of what has already been set forth herein, I find that this is just one further example of defendants' cavalier attitude toward an order of this Court.[4]

One further observation is in order in light of the foregoing. Rayex admittedly received 9,000 copies of the condemned catalog which would have been a sufficient amount to distribute to all of the

3. Paragraph 2A of the injunction order provided:
   2. ORDERED that the defendants:
   A. Withdraw their ASTRO-SKI catalogue (Plaintiffs' Exhibit 2 annexed to the Complaint) by mailing to all persons, firms, organizations and companies known or believed to possess a copy of same, a letter in the form annexed as Exhibit A to this Order, said letter to be mailed by defendants within ten (10) days of the date of this Order. Defendants shall maintain accurate records of the addressees of such letters and the respective dates of mailing.

4. Tunkel also stated:
   "I believe that on a Friday, *which was July 1st, when we first received this injunction order*, order of preliminary injunction, I sat down with Gordon Hallerman and also had a discussion with Mike Friedman and we tried to ascertain amongst ourselves who would possibly possess a catalog that we would know of, and between the three of us we came up with the names of the eleven people to whom the letters were sent." Tunkel Affidavit of November 14–15, 1966, at 834. (Emphasis added.)
   An affidavit submitted on behalf of plaintiffs by one Nathan H. Lotter, legal and docket clerk for plaintiffs' counsel, indicates that the order was not signed until the close of the Court's business day on July 1, 1966. However, defendants' counsel was notified by my chambers of the signing of said order on that same day. That this conversation described by Tunkel in fact took place must be considered in the light of his statement on oral deposition that he was not in New York for most of the period from July 1 through July 17, 1966. No notice of the signing of the order appeared in the New York Law Journal until July 6, 1966. However, no weight need be given to this possible inconsistency in reaching the conclusions herein.

persons on its mailing list, to its sales representatives, and still make credible its statement that several thousand catalogs were destroyed. Rayex argues that ten wholesale customers could have received five hundred catalogs each and therefore all recipients were thus notified. Although, as noted, plaintiffs have a very substantial burden of proof on this contempt motion, it is my opinion that this burden has been adequately satisfied and the burden of going forward must shift to defendants at this point. No showing whatsoever has been made by Rayex with respect to the number of catalogs received by those persons to whom notice of the injunction was allegedly given. Here, again, defendants have no records to substantiate their argument.

The Exhibit A letter which was to be sent to defendants' distributors stated that "Our new ASTRO-SKI catalogue will be out shortly." The letter that was allegedly sent to the eleven distributors stated, "Our new Astro-Ski catalog covering the 1966–1967 season is herewith enclosed." Plaintiffs contend that defendants rushed through two hundred copies of the new catalog to soften the effect of the Court's order. Defendants claim that the catalog was needed for a sales meeting. An examination of this catalog and a comparison with a later run thereof reveal an imperfection in color of the earlier run and lend support to plaintiffs' claim that these were hurriedly prepared. However, I need not speculate as to the reason for the rushed preparation of the new catalog since the evidence of defendants' contempt has been sufficiently set forth. Suffice it to say that, taking this allegation with all of plaintiffs' other evidence, it would appear that this was an attempt to soften the effect of the Court's order, and defendants' conduct in not seeking an order of this Court amending the Exhibit A letter appears questionable. However, under the circumstances, little weight need be given to this factor.

Rayex argues, first, that no facts have been adduced which would show that it failed to comply with the preliminary injunction order; second, that the catalog was obsolete and it was therefore believed that it would no longer be in anyone's possession; and, third, that compliance was as complete as possible since there was no mailing list for the ski-glass catalog.[5]

The first argument is without merit as has been demonstrated previously herein. The second argument immediately brings one question to mind: If it were believed that the catalog was not in anyone's possession, why was notice of the Court's order sent to anyone? Additionally, the fact that the catalog may have been nearing the end of its useful life does not establish that customers did not have copies of it which they still utilized to place orders from Rayex, especially in light of the fact that a new catalog had not as yet been issued. If the meeting to determine who was in possession of the condemned catalog in fact took place, from the deposition testimony of Tunkel and Hallerman it would appear that any discussion of obsolescence was an afterthought— an excuse for the failure to comply with the injunction. As plaintiffs correctly argue, "Defendants had no way of knowing whether or not catalog recipients had destroyed or discarded the catalog and the only way they could have complied with this Court's Order * * * would have been to advise all possible customers of this Court's Order." Plaintiffs' Reply Memorandum, at 2. The only conclusion that this Court can reach is that defendants' obsolescence argument is a further manifestation of their continued bad faith in complying with the clear terms of the injunction. Finally, defendants' third argument is refuted by the Tunkel affidavit which stated that the catalog was circulated to Rayex' regular wholesale distributors.

Accordingly, based on all the evidence presented, the Court is firmly convinced

---

5. Other arguments have been presented as well and have been alluded to and dismissed in the discussion supra.

that plaintiffs have overwhelmingly sustained their burden of proving defendants' contempt.

### The Applicable Law and the Formulation of an Appropriate Remedy.

██ It is well established that defendants cannot now question the propriety of the injunction order since they neither appealed that order nor sought reargument. Alemite Mfg. Corp. v. Staff, 42 F.2d 832 (2d Cir. 1930); see Leighton v. Paramount Pictures Corp., 340 F.2d 859 (2d Cir.), cert. denied, 381 U.S. 925, 85 S.Ct. 1560, 14 L.Ed.2d 683 (1965). Thus the only issue facing this Court on plaintiffs' motion to punish for contempt is whether defendants have complied with the terms of the order and in particular paragraph 2A thereof. And, as has been hereinbefore set forth, this issue is determined adversely to defendants. Since defendants have failed to comply with the order, plaintiffs, as a matter of right, are entitled to have them held in civil contempt with only the manner of the punishment being within the Court's discretion. E. Ingraham Co. v. Germanow, 4 F.2d 1002 (2d Cir. 1925); In re Sylvester, 41 F.2d 231, 236 (S.D.N.Y.1930).

On this motion to punish for contempt, plaintiffs seek attorney's fees, motion costs for both the contempt proceedings and for defendants' cross-motion and an enlargement of the injunction order to the extent of requiring defendants to discontinue all sales of the Alpine sunglass style. It is my opinion that plaintiffs should be awarded the first two items but not the last.

██ When counsel for plaintiffs informed newly-appointed defense counsel that they would seek to punish defendants for contempt, counsel for Rayex obtained an agreement that the motion would be deferred "until the entire Rayex story was presented." In presenting the Rayex story, defendants intertwined the contempt issues with those concerning the motion to vacate. As will be developed infra, the presentation of this complete record more fully convinces me that the preliminary injunction was not improvidently granted and that defendants have merely employed tactics which appear to have been designed to divert the Court's attention from the contempt issue. Accordingly, defendants are ordered to compensate plaintiffs for their reasonable expenses incurred in presenting the contempt issue to the Court, Parker v. United States, 153 F.2d 66, 71, 163 A.L.R. 379 (1st Cir. 1946); Eustace v. Lynch, 80 F.2d 652, 656 (9th Cir. 1935); Christensen Eng'r Co. v. Westinghouse Air Brake Co., 135 F. 774, 782 (2d Cir. 1905), and this compensation, of necessity, must include the expenses incident to defendants' cross-motions since both motions are interrelated and since plaintiffs properly used the deposition proceedings to investigate the suspected noncompliance with the Court's order. Babee-Tenda Corp. v. Scharco Mfg. Co., 156 F.Supp. 582, 587 (S.D.N.Y.1957).

██ Damages for civil contempt may not be arrived at by mere conjecture. Id. 156 F.Supp. at 588. Accordingly, if the parties are unable to agree on the monies thus recoverable, they are to submit affidavits and the Court will make the necessary determination.

██ Plaintiffs' request for an enlargement of the scope of the injunction must be denied. Plaintiffs contend that the injunction as it stands at this time is totally ineffective since it has allowed defendants to enter the market unfairly. But plaintiffs do not dispute that only one further order for the 1011 Alpine was received from the date of the injunction to the time when the defendants' new catalog was circulated and this order was refused. The main purpose of the injunction was to create a hiatus in the defendants' sales obtained through use of an improper photograph and its sales engendered by fair business means. Whether defendants have complied with the injunction is immaterial in this limited respect since it is apparent that a cooling-off period was effected, albeit not by reason of the Court's order.

Additionally, portions of the injunction order were meant to expire by their terms upon the circulation of defendants' new catalog without the offending photograph. Other portions, such as the change in designation of the glasses and the segregation of bills, orders and other shipping records, still remain in effect so that the injunction can by no means be considered moot. Accordingly, it is this Court's opinion that extending the scope of the injunction would be an abuse of discretion and that plaintiffs are not entitled to this drastic remedy.

### Defendants' Motion to Vacate the Injunction.

■ There is ample authority for the proposition that an injunction order may be modified or dissolved in the discretion of the district court. However, such modification or dissolution requires a showing of changed circumstances so that continuance of the injunction is no longer justified and/or because it will work oppressively against the enjoined parties. United States v. Swift & Co., 286 U.S. 106, 114–115, 52 S.Ct. 460, 76 L.Ed. 999 (1932); Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 810 (9th Cir.), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); Tobin v. Alma Mills, 192 F.2d 133, 136 (4th Cir. 1951), cert. denied, 343 U.S. 933, 72 S.Ct. 769, 96 L.Ed. 1342 (1952); Grand Union Equip. Co. v. Lippner, 167 F.2d 958, 960 (2d Cir. 1948); California Packing Corp. v. Sun Maid Raisin Growers, 165 F.Supp. 245, 252 (S.D.Cal.1958). aff'd, 273 F.2d 282 (9th Cir. 1959); Mitchell v. Helena Wholesale, Inc., 163 F.Supp. 101, 103 (E.D.Ark.1958); see S. C. Johnson & Son, Inc. v. Johnson,

175 F.2d 176, 177 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949). In the absence of such a showing, the injunction will not be disturbed.

■ Accordingly, the sole issue I am faced with herein is whether there have been such new circumstances shown that would warrant dissolution of the injunction. Defendants' contention that plaintiffs' cause of action is not within Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is not properly raised at this time since defendants have had their day in court on this issue (at least at this time), and neither appealed this Court's injunctive order nor sought timely reargument. Therefore, any consideration of this issue does not fall within the aforementioned criteria for modifying or dissolving the injunction.[6] Moreover, the remainder of defendants' arguments, rather than showing a change in conditions from the time the injunction was granted, merely rehashes, in far greater detail to be sure, most of the arguments previously presented to the Court and as such would appear to be improperly raised herein. However, even considering the offer of proof as properly before this Court, I am more fully convinced than before that there was no impropriety in the granting of the injunction.

■ Defendants' version of the facts is set forth as follows: In 1965, Rayex decided to introduce a line of ski-sunglasses to be called "Astro-Ski." Raymond Tunkel, Rayex president, saw AO's C'Bon Camelot and thought it would make an attractive ski-sunglass if the Polaroid glass were removed therefrom and photochromic lenses [7] substi-

6. Defendants' argument on the law is that plaintiffs in order to bring themselves within the Lanham Act must show "a false designaton of origin." See, e. g., Societe Comptoir De L'Industrie Cotonniere Establissements Boussac v. Alexander's Dep't Stores, Inc., 299 F.2d 33 (2d Cir. 1962); Joshua Meier Co. v. Albany Novelty Mfg. Co., 236 F.2d 144 (2d Cir. 1956). However, to sustain a cause of action under § 43(a) of the Act, a plaintiff must

allege *either* "a false designation of origin, *or* any false description or representation." (Emphasis added.) See Societe Comptoir De L'Industrie Cotonniere Establissements Boussac v. Alexander's Dep't Stores, Inc., supra at 36. Plaintiffs appear to have clearly brought themselves within the second alternative.

7. The photochromic lens, a product of the American Cyanamid Corp., was designed

tuted. Defendants allege that Tunkel gave Oram Morin, manager of Rayex' Plainville, Connecticut, plant, a pair of Camelot glasses and asked him to make a hand-copy thereof, which was to be used as a prototype for a Rayex model. Mr. Tunkel allegedly received the hand-made prototype from Morin and took it with him to Europe where it was intended that a mold would be made. While in Europe, Tunkel decided to have the glasses manufactured there thus eliminating the need for a mold. Tunkel purportedly took the prototype back with him from Europe and turned it over to Gordon Hallerman for the purpose of having it included in the Astro-Ski catalog. Hallerman claims to have taken the prototype to one Harvey Dresner, a professional photographer who prepared photographs for the catalog. The handmade prototype allegedly disappeared at a subsequent sales meeting.

Plaintiffs contend that the deposition testimony of Tunkel, Hallerman and Dresner [8] is a fabrication and the record strongly indicates that plaintiffs' assertion is correct, as will be fully set forth infra. Defendants contend that plaintiffs' claim of a fabricated story is tantamount to a charge of fraud which must be proved by clear and convincing evidence. Defendants' argument is purely sophistic. An attack on the credibility of witnesses does not change the underlying action into a fraud action, nor shift the burden of proof. Nevertheless, even assuming defendants' argument to be worthy of merit, I conclude that plaintiffs have sustained the heavier burden which defendants seek to place on them.

At the outset, defendants rely heavily on the production by Morin, at his deposition, of a heavy wooden block, a steel template and two metal front-pieces. which, defendants claim, fully corroborate the deposition testimony. Morin claims to have shaped the block to show the compound angles in the original front-piece and to insure his ability to reproduce those angles. The steel template was to be used as a pattern in making the front-piece for the prototype. Morin claims that the metal front-pieces were made at the same time as the front-piece for the handmade model and were duplicates thereof.

But would not a defendant who is accused of committing the acts alleged herein, to refute those accusations, attempt to locate some credible evidence that a prototype in fact existed and was used in the preparation of the catalog? Of course, the best evidence of this would be the prototype itself. Failing to locate this, defendant would be expected to produce the wooden block, the steel template and the duplicate front-pieces as evidence of the prior existence of the prototype. But where were these items in June or July of 1966 when the motion was argued or when reargument could have been sought? Why was the Tunkel affidavit unsupported in June of 1966 if evidence of the existence of a prototype existed? I cannot accept the presence of these items at this time as any corroborative evidence whatsoever of the deposition testimony.

The major argument presented herein by defendants is that, on the prior motion, plaintiffs failed to inform the Court of the existence of a physical difference between the alleged Morin prototype and the C'Bon Camelot. Defendants claim that Morin, in shaping the outer end of the temple of the alleged handmade model, made a mark close to the ear end of the temple with his pliers, resulting in an abrupt angular change of the plane

---

to respond to the degree of light prevailing so that in bright sunlight it turns a deep gray, cutting down the light transmitted, whereas in dim areas the lens retains its basic amber color, thus allowing a larger amount of light transmission.

8. No discussion is necessary of the deposition of one Saul Lustig, foreman of Gordonian Lithographers, Inc., producer of the condemned catalog, since Lustig never claims to have seen the alleged prototype.

of the outer surface of the temple at that point and which appeared in the photograph as a sort of obelisk with a wide base, blunted tip and tapered sides, and in the bottom line of that surface as an angular change of line.

This contention is thoroughly refuted by plaintiffs. Firstly, Gino L. Agraz, an independent photographer employed by plaintifs, at plaintiffs' request almost exactly reproduced this so-called plier mark in a pair of Camelot glasses by photographing said glasses on a dark background paper. It is his opinion that this mark was nothing more than a photographic highlight. While defendants dismiss the Agraz work as mere trick photography, I have examined his affidavit and the transcript of his testimony on this motion and find that he has candidly set forth the work he performed and his testimony is highly credible. Additionally, Mr. Dresner, defendants' photographer, admitted the authenticity of the Agraz work.

Secondly, at his deposition Mr. Morin was asked to combine one of the metal front-pieces he allegedly made with the frame of a stock model of the C'Bon Camelot. When he had done so, a photograph of the result of his work was taken by Dresner. This photograph almost exactly shows the same angular change of line of the right temple which defendants characterize as peculiar to the 1011 Alpine catalog photograph. Both sides agree that the Dresner photograph is of the Camelot frame with the handmade front-piece. Thus, both differences alleged to exist are shown to be mere results of varied photographic conditions.

Thirdly, the Morin deposition indicates that both temples were flared out and had plier marks. Although the alleged Alpine photograph depicts the exterior portion of the right temple extremity and the interior portion of the left one, assuming the defendants are correct in their contention that a plier mark had been made, such plier mark is conspicuous by its absence from the left interior portion of the temple of the catalog picture. Defendants argue that the

marking that would appear on the rear face would be entirely different than that appearing on a front face since the surface on the rear face is stretched out rather than bent in. Whether the marking on the inner surface would be the same or different is immaterial—some marking should appear either from the plier mark itself or from a highlight thereof if defendants are to be believed. Accordingly, for the foregoing reasons, I find defendants' plier mark argument without merit.

Certain other discrepancies in defendants' evidence appear which make the existence of a prototype unlikely. Hallerman testified that he took the prototype to Dresner to be photographed and that he knew that it was a handmade sample, *inter alia,* because "the finish of the front * * * of the hand-made sample * * * was a dull finish and did not look to me like a finished glass." Hallerman Deposition of November 8–9, 1966, at 306. He reiterated, "the handmade sample which was given to me by Mr. Tunkel was dull and looked to me to be unfinished. It did not appear to be a sample which had been or could be purchased in a store as a first quality piece of merchandise." Id. at 307. On cross-examination, plaintiffs' counsel elicited from Hallerman the response that the metal front-pieces of the handmade prototype resembled the duplicate metal front-pieces allegedly made by Morin. Id. at 462–63. Defendants argue that it is probable the aluminum front-piece used in making the prototype was more highly polished than its duplicates, but that in any event the difference is only slight and can be readily accounted for by the handling it has received. The Hallerman testimony refutes defendants' first argument and, as for the alternate contention, I have examined the metal front-pieces of the so-called duplicates and they are dull, pitted and scarred. It is highly unlikely that a front-piece such as either of the duplicates could have possibly been used to obtain the highly-polished result that appears as the 1011 Alpine in the Astro-Ski cata-

log. Contrary to defendants' position, the difference is most pronounced, and graphic evidence of this has been presented to the Court in the Dresner photograph of the Camelot frame with the handmade front-piece which clearly indicates the inferior result that would have been obtained by using the handmade front-piece in the catalog picture.

It has also been shown by defendants' witnesses that on other occasions where Rayex had copied sunglasses no handmade prototype had been prepared. Rather, the sunglass to be copied had been used to prepare the mold. Id. at 460–61. It would appear highly unlikely for Rayex to have asked a busy executive such as Mr. Morin to spend one full week in the preparation of the prototype when all Tunkel had to do was take a pair of the Camelot glasses to Europe with him and have them used in preparation of the mold. The only possible purpose for the construction of the prototype would be for the catalog photograph, and no such purpose appears from the deposition testimony. Defendants' argument that AO prepared prototypes is irrelevant since AO is an innovator and must of necessity prepare something from which a mold can be made.

Additionally, and most significantly, when Tunkel returned from Europe he corresponded with his French manufacturer and referred to the sunglasses he had taken with him as "the wrap-around type metal front polaroid glass." In the French manufacturer's reply of May 26, 1965, the sunglasses are referred to in the same manner, and in a letter of July 2, 1965 to Tunkel are again referred to as the "Polaroid sunglass." In Tunkel's reply of July 6, 1965, the glasses are described in the same way. It was developed in the Tunkel deposition that he was aware that "Polaroid" is a trademark of the Polaroid Company, that AO was the exclusive licensee of Polaroid polarizing material for a number of years, that Rayex had not sold Polaroid lens sunglasses for some ten years, that in 1964–1965 Rayex sold no polarizing lenses,[9] and that the C'Bon Camelot was sold with Polaroid lenses. It would appear from the foregoing that what Tunkel took with him to Europe was the Camelot rather than the Alpine prototype as he claimed. Defendants' only refutation of this argument is that it is pure speculation. Rather than being explained away, the abovementioned conclusion is inescapable and renders Tunkel's testimony even more incredible.

All the factors hereinbefore set forth plus the great differences between the alleged Alpine photograph and the marketed products, and the absence of any sketches, notes, photographs or other identifying memoranda of Morin's work in preparation of a prototype lead to the conclusion that the July 1, 1966 injunction was properly granted. Any deficiencies alleged to have been present at that time (if these can even be considered to have affected the determination) have been readily cleared up by the extensive record herein which demonstrates, at least for the purpose of granting a preliminary injunction, that the photograph of the 1011 Alpine actually was that of the C'Bon Camelot.[10] This conclusion can be reached without even considering the photographic evidence submitted by plaintiffs which shows almost perfect registry between the 1011 Alpine picture and the picture of a stock pair of C'Bon Camelot glasses. Any slight failure of registry is readily explained by the difference in temples in any two pairs of glasses, changes caused by buffing, polishing, wear in stamping tools, and numerous other variables.

9. The photochromic lenses used in the 1011 Alpine cannot be characterized as polarizing type lenses.

10. Additionally, defendants' contention that AO failed to inform the Court of the difference in lenses between Alpine and Camelot is rejected. See n. 1 to American Optical Co. v. Rayex Corp., 266 F.Supp. 342, S.D.N.Y., June 28, 1966.

**514**

## CONCLUSIONS

Plaintiffs' motion to punish for contempt is granted to the extent indicated herein. If the parties cannot agree as to the appropriate monies to be recovered, affidavits should be submitted to the Court on this issue no later than May 15, 1967. Defendants' cross-motion to vacate the injunction is in all respects denied.

The findings of fact and conclusions of law as required by Rule 52(a) are contained herein.

Settle order on one (1) day's notice in conformity herewith.