**BROADVIEW CHEMICAL CORPORATION**

v.

**LOCTITE CORPORATION.**

Civ. No. 10713.

United States District Court,
D. Connecticut.

Jan. 2, 1970.

William J. Doyle, New Haven, Conn., Granger Cook, Jr., Chicago, Ill., for plaintiff.

J. Rodney Reck, Newington, Conn., W. Robert Hartigan, Hartford, Conn., Walter D. Ames, Washington, D. C., for defendant.

### RULING ON DAMAGES, COSTS AND ATTORNEY'S FEES FOR CIVIL CONTEMPT

BLUMENFELD, District Judge.

On June 19, 1968, after a hearing, Broadview was found in civil contempt

for having violated a consent decree by selling "Sta-Lok", an anaerobic sealant, made by it from admittedly infringing formulae of Loctite's concededly valid patents. Loctite was held entitled to recover damages and attorney's fees and cos⁺ˢ incurred in prosecuting the motions for contempt. The amount of the award for those items, and for damages resulting from the infringement was left open pending attempted accord between the parties. *See* Laufenberg, Inc. v. Goldblatt Bros., 187 F.2d 823 (7th Cir. 1951); Abbott v. Barrentine Mfg. Co., 255 F.Supp. 890, 901 (N.D.Miss.1965).

They have been unable to reach agreement as to the amount of costs and attorney's fees to be awarded, and disagree as to the appropriate measure and amount of damages. Agreed statements of fact and briefs in support of their respective positions have been submitted and at a hearing counsel limited themselves to arguments on the effect to be given to the agreed statements. No further evidence was offered at the hearing.

### Damages

■ The first question considered is what damages Loctite has proved. At the outset, it is well to remember that this is an action for civil contempt and not directly one for patent infringement. In civil contempt proceedings, the general rule is that damages may be awarded in the form of a fine payable to the party injured by the acts of the contemnor, and are to be remedial and compensatory, not punitive, in nature. United States v. United Mine Workers of America, 330 U.S. 258, 302–304, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448,

52 S.Ct. 238, 76 L.Ed. 389 (1932); Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467, 469 (2d Cir.1958). While the court has wide latitude in the assessment of damages, E. Ingraham Co. v. Germanow, 4 F.2d 1002 (2d Cir. 1925); Long Island R. R. v. Brotherhood of R. R. Trainmen, 298 F.Supp. 1347, 1350 (E.D.N.Y.1969), damages cannot be arrived at by conjecture. American Optical Co. v. Rayex Corp., 291 F.Supp. 502, 509 (S.D.N.Y.1967), *aff'd*, 394 F.2d 155 (2d Cir.) *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L. Ed.2d 106 (1968). Since this is a civil contempt proceeding, the court is not bound by the statutory provision, 35 U. S.C. § 284,[1] relating to damages for patent infringement. Leman v. Krentler-Arnold Hinge Last Co., *supra*; Georgia-Pacific Corp. v. United States Plywood Corp., 243 F.Supp. 500, 539–540 (S.D.N.Y.1965). However, since that statute relates to the subject matter underlying the contempt and both parties refer the court to it, it is not inappropriate to utilize it to measure the damages in this case.

The parties have advanced two theories as to the measure of damages. Plaintiff Loctite urges the court to adopt the so-called "lost profits" theory under which the injured party is awarded damages on the basis of the profits it would have made had it made the sales which the infringer made in contempt of the order not to infringe. Defendant, on the other hand, would have the court adopt the "reasonable royalty" measure whereby the contemnor is required to pay a reasonable royalty on the infringing sales.

■ It has been held in this circuit that in order to recover lost profits in

---

1. "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

"When the damages are not found by a jury, the court shall assess them. In ei-

ther event the court may increase the damages up to three times the amount found or assessed.

"The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances."

patent infringement cases, "[t]he holder of the patent must show that he would have made the sales if the infringer had not." Power Specialty Co. v. Connecticut Light & Power Co., 80 F.2d 874, 875 (2d Cir.1936). Similarly, the court in Electric Pipe Line, Inc. v. Fluid Systems, Inc., 250 F.2d 697 (2d Cir.1957), while allowing lost profits, was careful to point out that the findings of fact "justify the conclusion that *but for* Electric Pipe's infringement, Fluid Systems would have made all these installations." *Id.* at 699 (emphasis added). *See also* American Safety Table Co. v. Schreiber, 415 F.2d 373 (2d Cir.1969), where lost profits were awarded on the basis of a special master's finding that "but for defendants' sale * * * purchasers would have bought from plaintiff in order to supply their need * * *." *Id.* at 378.

■■ In deciding whether the lost profits measure should be applied in this case, one factor to support its applicability is that there were no other sources of supply. There were only two manufacturers of these unique patented anaerobic sealants, Loctite and Broadview. Consequently, if those who bought them from Broadview would have bought them from someone else, they had nowhere to turn but to Loctite.

Although recognizing that "[t]here is no presumption that appellant would have sold its devices to those who purchased the infringing articles," the court in Oil Well Improvements Co. v. Acme Foundry & Machine Co., 31 F.2d 898, 901 (8th Cir.1929), nevertheless observed:

"The cost of either device was negligible in comparison to its saving to the customer so it may be assumed, practically to a certainty, that those of that class who bought the infringement would have bought the appellant's device (*it being the only other one on the market*) if they had not bought the infringement." (Emphasis added).

Arguing that this still does not necessarily establish that they would have bought from Loctite, *cf.*, Power Specialty Co. v. Connecticut Light & Power Co., *supra*, 80 F.2d at 875, Broadview calls attention to deposition testimony of an independent marketing consultant that the same results from the use of anaerobic sealants can be obtained by using "mechanical techniques for fastening. * * * Examples are clamps, clamping if you will, welding or brazing, lock washers, lock nuts * * *." (Deposition of David N. Reece at 18). But anaerobic sealant is unique not only in its composition, but also in the way it accomplishes the desired fastening. Indeed, Broadview's consultant also testified that his investigation disclosed "no other products that get the same results in the same way." (Def.'s Exh. L–8 at 9). Manufacturers who use one or more of the alternative ways of getting the same result may be potential customers who can be persuaded to change to anaerobic sealants, but it is likely that Broadview's customers who bought its "Sta-Lok" had either never used the alternative methods or had already made the switch to an anaerobic sealant. And it is worth noting that users of anaerobic sealants are manufacturers for whom a change to another method would most likely require a considerable change in their own manufacturing methods. Anaerobic sealants are not shelf items in a neighborhood hardware store; they are sold through distributors or manufacturers' representatives. In a less compelling situation, the court in Continuous Glass Press Co. v. Schmertz Wire Glass Co., 219 F. 199 (3d Cir.), *cert. denied*, 238 U.S. 623, 35 S.Ct. 661, 59 L.Ed. 1494 (1915), thought that the "but for" rule would be satisfied, stating at 206 of 219 F.:

"There is no doubt that, if the defendant had not manufactured the glass in question, the complainant would have produced and sold to its own profit an equal amount, for the complainant and the defendant at that time were the only manufacturers of this product."

If Broadview had sold its sealants at prices substantially lower than Loctite's, that might militate against a finding that Loctite would have made the same sales; but the fact is that the prices at which Broadview sold the infringing sealants were almost identical, for each grade, to Loctite's prices. Thus, what appears to me to be a high price policy strengthens the conclusion that Broadview's customers would have bought from Loctite if Broadview had not made the sales. Customers were willing to pay the price.

I do not understand that satisfaction of the "but for" rule requires the injured party to negate *all possibilities* that the purchasers would not have bought a different product, *cf.* Electric Pipe Line, Inc. v. Fluid Systems, Inc., *supra*, 250 F.2d at 699, or that the proof must be convincing beyond a reasonable doubt. Insofar as sales of the sealants to customers for use in the United States are concerned, I find that in all reasonable probability Loctite would have made the sales had Broadview not made them. *See* Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469, 471–472 (5th Cir.1958). Some of Broadview's sales were to customers for use abroad. Since these must be considered separately, an analysis of the sales is in order.

### Sales by Broadview

The total sales of anaerobic sealants by Broadview from February 14, 1967, the date of the consent decree, to April 21, 1969, when Broadview ceased selling the infringing sealants, may be divided into two classes. One class consists of sales in the United States for use there (hereafter "domestic sales"); the other, of sales for ultimate use in foreign countries (hereafter "foreign sales").

### DOMESTIC SALES

Domestic sales, allowing for returns prior to April 21, 1969, amounted to $164,490.00. (See Loctite's and Broadview's presentation of agreed facts.) Broadview contends that this figure must be reduced by (1) material thereafter "returned or in process of being returned" in the amount of $34,187.62, and also by (2) "Estimated Material to be Returned" in the amount of $26,850.-00. (Broadview's presentation of agreed facts at 2). Loctite, naturally, takes the position that there should be no deduction for any returns after the decree, arguing that these were the likely result of Broadview's own wrong in violating the decree.[2] However, consistent with my conclusion that Loctite would have sold those goods "but for" Broadview's sale of them, I consider that customers who did in fact return Broadview's infringing sealants without using them were then likely to become customers of Loctite.

The "Estimated Material to be Returned" calculated as of August 1969 stretches the somewhat vague concept of "Material in the Process of Being Returned" to the point where it is too elusive to be accepted in mitigation of damages. Accordingly, I find that domestic sales by Broadview in violation of the decree of February 14, 1967, amounted to $130,302.38.

### Lost Profits

Over a period of 2½ years, from October 1, 1966, through March 31, 1969, Loctite's total sales of its anaerobic sealants amounted to approximately $7,-750,000. (Def.'s Exh. L–16). It was well represented throughout the market, and its manufacturing facilities and personnel could have handled the additional volume of some $277,000 (foreign and domestic) sold by Broadview from Feb-

---

2. There would seem to be inferential support for this argument, considering that over 20% of domestic sales were "returned or in process of being returned" after Broadview was found to have violated the decree, whereas there was less than 1% of such returns from foreign sales.

ruary 14, 1967, through April 21, 1969 (Plaintiff's and Defendant's Presentation of agreed facts), without any increase in administrative, market development, advertising, or research and development expenses. (See Def.'s Exh. L–16). Very little increase in expense for district managers would have been entailed. The selling expenses listed by Loctite as "Variable" (travel and entertainment, incentives and commissions) (Def.'s Exh. L–16) were likely to have increased in direct proportion to increased sales. This increase, based on past figures (Def.'s Exh. L–16) would have been about 6.6% of the increase in sales. Allowing generously also for a likely increase in other expenses, such as telephones, auto depreciation of salaried district managers, labmobile and training schools, I find that the increase in Loctite's business by the amount of infringing sales Broadview made would have been carried out at an added expense of no more than 20.2% of those sales. Adding to that the cost of goods sold, which amounted to 19.8% of the sales (Def.'s Exh. L–16), Loctite would have realized a profit of 60%. As damages for domestic sales of infringing products by Broadview, Loctite is entitled to recover 60% of $130,302.38, or $78,181.43. Since this amount was unliquidated, no interest is added.

FOREIGN SALES

Computing the amount of sales for use abroad (although technically some of those sales were completed in the United States), in the same way that domestic sales were figured, I find that Broadview sold $112,480.00 of infringing products from February 14, 1967, through April 21, 1969. Deducting the amount of "Known Material Returned and in Process of Being Returned" consisting of $1,047.91, Broadview is liable for damages attributable to sales of $111,432.09. Not only would Loctite face more than one foreign competitor but other factors inherent in the protection of patent rights in foreign countries are such that I am not persuaded that there was a reasonable probability that Loctite would have made those sales "but for" the sale of them by Broadview. Without sufficient proof that foreign sales would have been made by Loctite but for Broadview's sales for use abroad, damages resulting from those sales should be measured by a reasonable royalty.

According to Broadview's Financial Statements (Def.'s Exh. L–28), it made a gross profit for the calendar years 1967 and 1968 of approximately 59% and 58% respectively. Although it sustained a net loss because of high legal fees, those expenses would not be attributable to a license to make and sell Loctite's anaerobic sealants. There would be a substantial benefit from a license in the acquisition thereby of manufacturing know-how. (In this connection, it is instructive to note that Loctite's cost of goods sold (Def.'s Exh. L–16) was less than one-half of Broadview's (Def.'s Exh. L–28) when both are measured as a percent of gross sales.) Moreover, the benefits of Loctite's advertising and research would inure to a licensee. True, selling expenses would be incurred, but the protection afforded by Loctite's patent would serve to keep prices up. Loctite earns 36.6% on its own, after cost of goods, selling expenses, administrative expenses and research and development expenses (only ¼ of which are expensed). Def.'s Exh. L–16.

Since there was no established license fee, the extent of the sales by Broadview, the uniqueness of the sealant, and the facts outlined above are sufficient for ascertainment of a royalty rate to be used as a measure of damages. See Suffolk Co. v. Hayden, 70 U.S. (3 Wall.) 315, 320, 18 L.Ed. 76 (1865); Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 649, 35 S.Ct. 221, 59 L.Ed. 398 (1915). The lack of express testimony or the testimony of plaintiff's expert are not binding on me any more

than it would be on a jury. *Cf.* National Tube Co. v. Mark, 10 F.2d 430, 432 (6th Cir. 1926). It is my opinion, and I find that damages for foreign sales should be based on a royalty rate of 20%.[3] Accordingly, Loctite is entitled to recover the additional amount of $22,286.42, with interest at the rate of 6% from June 19, 1968, the date of the contempt decree, from Broadview as damages from its foreign sales of infringing anaerobic sealants.

### Increased Damages

There was an element of turpitude involved in the conduct of Broadview in reselling, and in making and selling more of the very sealants which it had agreed were infringements of Loctite's patents. That conduct appears to have been reckless of the consequences to itself, as well as of injury inflicted upon Loctite. However, to the extent that double or treble damages serve a punitive purpose, they may not be awarded in a civil contempt proceeding. United States v. United Mine Workers of America, *supra*, 330 U.S. at 303–304, 67 S.Ct. 677.

There is also another circumstance which stays me from increasing the damages up to three times the amount awarded for Broadview's foreign sales. The authority to increase damages, 35 U.S.C. § 284, *supra* note 1, is part of the statutory scheme to afford protection to those inventions which the government has found deserving of a patent.[4] *Cf.* McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Thus, where it has become necessary to subject the patent to the scrutiny of the court in an adversary proceeding to vindicate it, the public interest has been satisfied. *Cf.* Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945). Here, the rights sought to be protected are those which the parties arrived at by bargain and embodied in the consent decree. They thereby withheld full adversary inquiry into the validity of the patent. Furthermore, Loctite initiated this proceeding for contempt, although it could have brought a separate action for infringement. Thus, the issues before the court, as perceptively noted by the United States Court of Appeals for the Second Circuit, was not whether Broadview infringed, but whether it violated the terms of the consent decree. Broadview Chemical Corp. v. Loctite Corp., 406 F.2d 538, 543, 544 (2d Cir.), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1472, 22 L.Ed.2d 755 (1969).

Principles of equity fully support the damages awarded in this matter, Leman v. Krentler-Arnold Hinge Last Co., *supra*, 284 U.S. at 457, 52 S.Ct. 238, but since the statutory authority of 35 U.S.C. § 284, although a helpful guideline, is still one step removed from direct applicability to this case, I do not resort to it to increase damages.

Since an award for double or treble damages in a patent infringement suit is remedial rather than penal, Activated Sludge, Inc. v. Sanitary Dist. of Chicago, 64 F.Supp. 25, 35–36 (W.D.La.), *aff'd,* 157 F.2d 517 (7th Cir.1946), *cert.*

---

3. Loctite is able to realize a profit of almost 40% after cost of manufacture, selling and administrative expense. Def.'s Exh. L–16. *Cf.* Power Specialty Co. v. Connecticut Light & Power Co., supra, 80 F.2d at 878. With the benefit of Loctite's know-how, a licensee should be able to reduce Broadview's cost of goods sold from slightly over 40% of gross sales to Loctite's, about 20%. It is noteworthy also that Broadview paid a 6% commission on sales and maintained a single salesman at a modest salary only in 1968. See Def.'s Exhs. L–26 and L–28.

4. The legislative policy is to "protect the rights secured to the patent owner by his patent." Senate Comm. on Patents, S. Rep.No.1503, 79th Cong., 2d Sess. 2 (1946).

**454**

*denied*, 330 U.S. 834, 67 S.Ct. 970, 91 L. Ed. 1281 (1947), it is more properly utilized in those cases where the actual injury may be elusive of proof, than in this case where full discovery has been allowed and had on the question of damages. If there was anything more which Loctite may have suffered, it was open to it to get the proof.

### Attorney's Fees and Costs

 The Court of Appeals affirmed the judgment in this case to the extent that it awarded to Loctite its costs and attorney's fees attendant. Their purpose is "not to punish the defendant for his offense, but to compensate the plaintiff for his injuries * * *." Doroszka v. Lavine, 111 Conn. 575, 578, 150 A. 692–693 (1930).

Loctite has submitted an itemized list of expenses, including attorney's fees, totaling $27,194.76. (Def.'s Exh. L–25). Broadview challenges only the reasonableness of the items making up that amount. I find the amount submitted for each item reasonable, except that one item on the list is not a recoverable attorney's fee or expense. Loctite has included $2,539.03 representing counsel fees and expenses attributable to the efforts of its house counsel on this case. I consider this to be a regular cost of doing business.

Loctite is awarded $24,655.73 costs and attorney's fees to be paid by Broadview.

To sum up, Loctite is awarded unliquidated damages in the amount of $78,181.43 for Broadview's infringing domestic sales; $22,286.42, with interest at the rate of 6% from June 19, 1968, as damages for Broadview's infringing foreign sales; and $24,655.73 costs and attorney's fees incurred in the prosecution of the contempt action.

So ordered.